UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ALEX YOUNG, | ) | |
| | ) | |
|     PLAINTIFF | ) | Civil Action No. 1:14-cv-1203 (BAH) |
| vs. | ) | |
| | ) | |
| RICHARD SARLES, | ) | |
| | ) | |
| | ) | |
|     DEFENDANT | ) | |
| | ) | |

### **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Alex Young respectfully submits this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. A Proposed Order and Statement of Material Facts are attached.

                        Respectfully Submitted,

                        /s/ Jeffrey Light
                        Jeffrey L. Light
                        D.C. Bar #485360
                        1712 Eye St., NW
                        Suite 915
                        Washington, DC 20006
                        (202)277-6213
                        Jeffrey.Light@yahoo.com
                        *Counsel for Plaintiff and Participating Attorney for*
                        *THE RUTHERFORD INSTITUTE*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALEX YOUNG,                    )
                               )
         PLAINTIFF             ) Civil Action No. 1:14-cv-1203
    vs.                        )
                               )
RICHARD SARLES,                )
                               )
                               )
         DEFENDANT             )
                               )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF FACTS

The Washington Metropolitan Area Transit Authority ("WMATA") is a tri-jurisdictional agency created by an interstate compact among the Commonwealth of Virginia, the State of Maryland, and the District of Columbia that oversees the Metro stations, among other authority, under the color of state and local law. The Defendant, Richard Sarles, is the General Manager and Chief Executive Officer of WMATA.

WMATA has adopted regulations that describe the types of activities that may be conducted on WMATA property by non-WMATA personnel or by the public. In particular, § 100.10 of WMATA's "Regulations Concerning the Use of WMATA Property" (hereinafter "WMATA Regulations"), permits free speech activity that takes place at a distance greater than fifteen (15) feet from any escalator, stairwell, faregate, mezzanine gate, kiosk, or fare card machine. Moreover, § 100.10 of WMATA's Regulations allows free speech activity in the "free area," i.e., above-ground area of Metro stations terminals, so long as no free speech activity

1

interferes with the pedestrian traffic flow in the usual egress and ingress to the station proper or to the fare gate. Meanwhile, § 100.10(d) of the WMATA Regulations prohibits individuals engaging in free speech activity from carrying out commercial activity.

Alex Young is a musician who engages in the activity of busking, including outside Metrorail ("Metro") stations in the D.C. metropolitan area. By "busking," Mr. Young refers to the activity of passively seeking donations by performing (in Mr. Young's case, playing a guitar) in a public forum and having a receptacle (a guitar case) for people to leave donations if they choose. Mr. Young intends to be in the area again in August 2014 and it is necessary for his financial survival that he have the right to busk, including at Metro stations. See Declaration of Alex Young, [ECF dkt: 2-1].

In October 2013, Mr. Young "busked" at the West Falls Church (Virginia) Metro station, more than fifteen (15) feet from the entrance of the station (i.e., more than fifteen (15) feet from any escalator, stairwell, faregate, mezzanine gate, kiosk, or fare card machine). A Transit Police (WMATA) officer approached Mr. Young and ordered Mr. Young to stop playing his guitar under threat of arrest. The officer explained that activity constituted "commercial activity," which was prohibited at this location. Fearing arrest, and based on the officer's assertion that Young's activity was prohibited under the law, Mr. Young stopped playing his guitar and left. *Id.*

On November 17, 2013, Young busked at the Ballston (Virginia) Metro station on the brick sidewalk along N. Stuart Street, more than fifteen (15) feet from the entrance to the station. Officer S. Henderson of the Transit Police, an employee, officer, and agent of WMATA, approached Young and threatened to arrest Young if he did not relocate off of WMATA station grounds and premises. Fearing arrest, Mr. Young discontinued his activity and left. *Id.*

Following the November 17, 2013 incident, Mr. Young called the Transit Police headquarters to inquire about the legality of busking near WMATA stations. He spoke with Sergeant Whitfield of the Transit Police headquarters, who advised Mr. Young that free speech activities are allowed at least fifteen (15) feet from a Metro entrance or exit. Sergeant Whitfield also advised Mr. Young that playing music for donations is not free speech but prohibited panhandling. *Id.*

Mr. Young desires to busk on the public forum areas of WMATA stations, more than fifteen (15) feet from any escalator, stairwell, faregate, mezzanine gate, kiosk, or fare card machine and without interfering with egress or ingress. However, he fears arrest if he does so and therefore is deterred from doing so. *Id.*

In a letter dated December 13, 2013 and addressed to Ronald Pavlik, Chief of Police of the Transit Police Department, legal counsel for Mr. Young asserted on his behalf that Mr. Young has a First Amendment right to engage in busking at the free, above-ground areas of WMATA Metro stations which are more than 15 feet from any escalator, stairwell, faregate, mezzanine gate, kiosk, or fare card machine, and that the assertions by Transit Police officers that he was not permitted to do so and could be arrested violate Young's constitutional right to freedom of speech. The letter requested assurances that Transit Police would respect Young's First Amendment rights and that he would not be ordered to stop busking or threatened with arrest for doing so. [ECF dkt: 2-2.]

In response, Mr. Young's legal counsel received a letter dated January 3, 2014 from the chief legal counsel for the Metro Transit Police asserting that Young's activities on WMATA property constituted prohibited "commercial activity" forbidden by the WMATA Regulations. The January 13 letter also asserted that Young's activity constituted panhandling, citing a case

involving a prosecution for panhandling near Metro stations in the District of Columbia. [ECF dkt: 2-3.]

**ARGUMENT**

I.     **STANDARD OF ADJUDICATION**

A party is entitled to summary judgment if he shows "that there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. Pro. Rule 56(a). The moving party bears the initial responsibility of informing the district court of the basis for his motion and identifying those portions of the record which he believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original.)

A fact is only "material" for purposes of summary judgment if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment. *Id.* A dispute as to a material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to avoid summary judgment. *Id.* at 252. To establish a genuine issue of fact the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

Summary judgment is particularly appropriate when the case involves primarily questions of law. *Harris v. Dist. of Columbia*, 561 F. Supp. 2d 63, 66 (D.D.C. 2008). This case involves primarily questions of law. *See United States v. Doe*, 968 F.2d 86, 88 (D.C. Cir. 1992) ("Whether the regulation meets the 'narrowly tailored' requirement is of course a question of law"); *Raymen v. United Senior Ass'n*, 409 F. Supp. 2d 15, 23 (D.D.C. 2006) ("Whether a communication is commercial or noncommercial is a question of law"); *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 515 (7th Cir. 2014) ("the question whether speech is protected by the First Amendment is a question of law"); *Abbott Labs. v. United States*, 573 F.3d 1327, 1330 (Fed. Cir. 2009) ("The interpretation of a regulation is also a question of law"); *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1111 (9th Cir. 1999) ("Standing is a question of law");

## II. STANDING

"In challenges under the First Amendment, two types of injuries may confer Article III standing without necessitating that the challenger actually undergo a criminal prosecution." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003). In the first, a Plaintiff has standing if he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbit v. United Farm Workers Nat'l*, 442 U.S. 289, 299 (1979). *See also Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995)("A party has standing to challenge, pre-enforcement . . . the constitutionality of a statute if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecution")(emphasis removed); *Skaggs v. Carle*, 110 F.3d 831, 836-37 (D.C. Cir. 1997) ("a party has standing to challenge a law before it is enforced

5

against him provided that his first amendment rights are chilled by a credible threat of prosecution under that law").

The second type of injury is when a plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Mangual*, 317 F.3d at 57. When a plaintiff asserts this type of inquiry, the existence of standing focuses on the danger that arises from self-censorship. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.")

A plaintiff can therefore establish an actual injury sufficient to support standing where he is chilled from exercising his right to free expression or is forgoing expression in order to avoid enforcement consequences. Whether the injury is based on a threat of prosecution or voluntary self-censorship, the fear of prosecution must be "objectively reasonable." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 30 (1st Cir. 1999). The Supreme Court's recent decision in *Susan B. Anthony List v. Driehaus*, __ U.S. __ (2014) clarified that in the context of a pre-enforcement First Amendment challenge to a penal statute, the appropriate test is that which was set forth in *Babbitt. See* 442 U.S. at 298. This standard is consistent with the well-established precedent in this circuit. *Chamber of Commerce*, 69 F.3d at 603; *Skaggs*, 110 F.3d at 836-37.

In this case, it is objectively reasonable for Mr. Young to fear prosecution were he to engage in his proposed busking activity (in the absence of a court-ordered injunction). The letter sent by WMATA Chief Counsel Bruce Heppen to Mr. Young's counsel Douglas McKusick [ECF dkt: 2-3], as well as Defendant's arguments during the course of this litigation, make this clear by articulating the view of WMATA that Mr. Young's desired busking activity is a violation of the WMATA Use Regulations. Further, Defendant has not disavowed enforcement of the WMATA

Use Regulations or suggested that the Regulations are moribund or a mere historical curiosity. Thus, Mr. Young has standing to bring this case based on the presumption that the government will enforce the law. *Hedges v. Obama*, 724 F.3d 170, 200 (2nd Cir. 2013)("[N]either this Court nor the Supreme Court has required much to establish this final step in challenges to ordinary criminal or civil punitive statutes. Rather, we have presumed that the government will enforce the law"); *Dombrowski v. Pfister*, 380 U.S. 479 , 494 (1965)("So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one"); *New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)("[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence"); *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 486 (8th Cir. 2006)(same); *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1995) ("A non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat, and a case or controversy thus exists in the absence of compelling evidence to the contrary")(internal quotation marks omitted); *Planned Parenthood Assoc. v. Cincinnati*, 822 F.2d 1390, 1395 (6th Cir. 1985) (the statutory language of a fetal disposal ordinance itself "evinces a credible threat of prosecution against Planned Parenthood").

While the fact that Mr. Young has also been threatened with arrest by WMATA police for his previous busking activity [ECF dkt: 2-1] bolsters his standing argument, the foregoing legal authorities establish that standing would exist whether or not he had been previously threatened with arrest. Thus, even if Defendant decides to take issue with Mr. Young's characterization of

7

these previous incidents, any dispute as to such facts would not be material because of the legal presumption that WMATA will enforce its regulations.

### III. WMATA USE REGULATIONS

WMATA Use Regulation 100.10 permits individuals to engage in "free speech activities" in the free area, with the caveat that carrying out "commercial activity" is forbidden. Under WMATA Use Regulation 100.7, "free speech activity" means "the organized exercise of rights and privileges that deal with political, religious, or social matters and are non-commercial," and "commercial activity" is defined as "any enterprise or venture by groups or individuals for the purpose of promoting or selling products or services, except food, drink and tobacco to transit patrons or the public." At oral argument on Mr. Young's motion for a preliminary injunction, Defendant conceded that if the proposed busking activity is non-commercial, it would be permitted in the above-ground free-area. Thus, the sole area of dispute for the Court to resolve in determining the applicability of the regulation is whether Mr. Young's proposed busking activity is "commercial activity."

Mr. Young's proposed conduct does not constitute commercial activity under the WMATA Use Regulations because he is not "promoting or selling" any "products or services[.]" Defendant does not contend that playing music alone constitutes "promoting or selling" a product or service, arguing only that accepting donations converts the conduct into prohibited commercial activity. However, accepting tips for playing music *gratis* clearly cannot constitute "selling" a product or service because there is no obligation on the part of the listener or passerby to provide anything of value to Mr. Young. Nor is Mr. Young "promoting" a product or service by busking because he is not presenting merchandise for sale or advertising his services.

8

Further, regardless of the specifics of Mr. Young's busking activity, it is an inherent feature of busking that the performer is not "selling" his or services. A musical performance on the street is a pure "public good" in the economic sense, incapable of being provided to only paying customers. J. Lake, *Demsetz Underground: Busking Regulation and the Formation of Property Rights*, 87 N.Y.U.L. Rev. 1100, 1113-14 (Oct. 2012) ("[M]usic to the extent that it provides a benefit, is a classic public good. A busker cannot exclude non-tipping passengers from enjoying her music while they wait for their train.") And because a busker's performance is not contingent on receiving consideration, it cannot be considered a sale. *See Ennabe v. Manosa*, 58 Cal. 4th 697, 720 (2014) ("A sale requires consideration[.]")

## IV. FIRST AMENDMENT

### A. Busking is covered by the First Amendment

Busking is a unique medium of expression with deep roots in this country (and others). It was part of colonial American life, from Williamsburg to Boston. S. Baird, *The History and Cultural Impact of Street Performing in America*, *available at* www.buskeradvocates.org/ssahistory.html (last visited October 7, 2014). Benjamin Franklin was a busker. *Id.* Later in American history, Eastern European immigrant and African Americans buskers became some of our nation's best-known musicians – Irving Berlin and Louis Armstrong, for example. *Id.*

Seeking donations is an inherent and inseparable part of busking. Indeed, the word "busking" derives from the Spanish "buscar" (to seek) and Italian "buscare" (to gain). The image of a busker seeking donations is firmly ingrained in the public's mind, whether in the form

9

of an open guitar case, a trained monkey collecting money from onlookers, or the passing around of a hat.  In the early Twentieth Century, buskers and homeless individuals were often lumped together, with governments and members of the public finding both to be "beggars" and "undesirables."  S. Tanenbaum, *Underground Harmonies: Music and Politics in the Subways of New York* (1995) at 232.  Indeed, up until 1985, a single regulation prohibited both from expressing themselves in New York's subway.  *Id.*

Because busking is its own unique form of expression, analyzing it by breaking into the "component" parts of performing art and soliciting money changes the message being conveyed to the public.  An article in the Washington Post in 2007 summed up the experience of Joshua Bell (one of the finest classical musicians in the world), who put on street clothing and went busking one day incognito: "He was, in short, art without a frame."  G. Weingarten, "Pearls Before Breakfast: Can one of the nation's great musicians cut through the fog of a D.C. rush hour? Let's find out," *The Washington Post Magazine* (Apr. 8, 2007), available at http://www.washingtonpost.com/lifestyle/magazine/pearls-before-breakfast-can-one-of-the-nations-great-musicians-cut-through-the-fog-of-a-dc-rush-hour-lets-find-out/2014/09/23/8a6d46da-4331-11e4-b47c-f5889e061e5f_story.html (last accessed October 7, 2014.)

Mr. Young has explained in his affidavit the message that his proposed busking activity is intended to convey and how that message is different from what would be conveyed if his guitar case was not permitted to be open.  [ECF dkt: 11-1.]  But the First Amendment protection afforded to his busking activity is not so fragile that it requires him to precisely articulate his message in a way that can be written down or verbalized.  The "particularized message" which the Supreme Court spoke of in *Spence v. Washington*, 418 U.S. 405, 411 (1974) does not require

"a narrow, succinctly articulable message[.]" *Hurley v. Irish-Am. Gay*, 515 U.S. 557, 569 (1995). If such a precondition were imposed, the First Amendment would not reach the "unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Id.*

For example, in *Loper v. N.Y.C. Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993), after pointing out that "[b]egging frequently is accompanied by speech indicating the need for food, shelter, clothing, medical care or transportation," the court held that "*[e]ven without particularized speech*, however, the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance" (emphasis added). The same can be said here. Busking is frequently accompanied by speech indicating the dependence on the artist for tips to make a living, but even without such a particularized message, the presence of a busker with an open guitar case conveys the message that support is welcome.

The Supreme Court has also made clear that a speaker's own inability to articulate the precise message he intends to convey, or even his own disavowal that his speech had any meaning at all, does not place speech outside the coverage of the First Amendment. In *Morse v. Frederick*, 551 U.S. 393, 401 (2007), Joseph Frederick admitted in a declaration that the words "BONG HiTS 4 JESUS" on a banner he unfurled at school "were just nonsense meant to attract television cameras." Despite Frederick's repudiation of the message having any meaning at all (he described it as "meaningless and funny,") the Court proceeded to apply its First Amendment jurisprudence. *Id.* at 402. Thus, in the present case, Mr. Young's subjective motivation for busking or the precise meaning he intends to convey are not "material facts" necessary to determining whether the First Amendment is implicated by his proposed activity.

11

**B. The ban on busking is subject to strict scrutiny under the First Amendment**

The WMATA Use Regulation should be subject to strict scrutiny because it is content-based, as applied. The WMATA Use Regulation distinguishes between speech asking for a donation and speech not asking for a donation. *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) ("Second, Rule F.3.a *is* content-based by its very terms. It specifically restricts street performers from communicating a particular set of messages – requests for donations") (emphasis in original); *N.J. Envtl. Fed'n v. Wayne Twp.*, 310 F. Supp. 2d 681, 694 (D.N.J. 2004) ("For the foregoing reasons, the Court finds that § 60-5 of Ordinance is content-based, because it discriminates against types of speech depending on the content of that speech. The Ordinance places impermissible restrictions on political, religious, charitable and non-profit canvassers who ask for donations as part of their canvassing activities.") It also distinguishes between sitting on a sidewalk with an open guitar case (which plainly does not involve the sale or promotion of goods or services) and playing music on a sidewalk with an open guitar case (which, if the Court has reached this stage of the analysis, it would have concluded does constitute the sale or promotion of goods or services).

Even if it was not content-based, strict scrutiny would still be applicable because the regulation is an absolute ban on a medium of expression – busking – in an entire forum. *See Wright v. Chief of Transit Police*, 527 F.2d 1262, 1264 (2nd Cir. 1976) (describing New York City's ban on commercial activity in the subway as a "complete proscription" and holding that "[w]hile the time, manner and place of solicitation may be regulated, before it can be totally banned, a compelling state interest must be shown.") The WMATA Use Regulation prohibits busking at any time, at any location, and in any manner. As such, it "will be upheld only if

narrowly drawn to accomplish a compelling governmental interest." *United States v. Grace*, 461 U.S. 171, 177 (1983)

### C. Busking is Not Commercial Speech

Solicitation of donations is speech that is protected by the First Amendment. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 789 (1988). It is no less protected when a person solicits on behalf of oneself. *See, e.g.*, *Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013) ("[B]egging, or the soliciting of alms, is a form of solicitation that the First Amendment protects"); *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013) ("[T]he speech and expressive conduct that comprise begging merit First Amendment protection"); *Smith v. City of Fort Lauderdale*, 177 F.3d 954, 956 (11th Cir. 1999) ("Like other charitable solicitation, begging is speech entitled to First Amendment protection"); *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2nd Cir. 1993) (the distinction between soliciting for an organized charity and soliciting for oneself "is not significant for First Amendment purposes").

While commercial speech may be entitled to less protection than non-commercial speech, *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562-63 (1980), busking and other solicitation for donations are not commercial speech. *United States v. United Foods*, 533 U.S. 405, 409 (2001) ("Commercial speech" is "speech that does no more than propose a commercial transaction"); *Bd. of Trustees v. Fox*, 492 U.S. 469, 473 (1989) ("[T]he test for identifying commercial speech" is whether it "propose[s] a commercial transaction"); *Schaumburg v. Citizens for Better Env't*, 444 U.S. 620, 632 (1980) ("[B]ecause charitable solicitation does more than inform private economic decisions and is not primarily concerned with providing information about the characteristics and costs of goods and services, it has not been dealt with in our cases as a variety of purely commercial speech"); *Gresham v. Peterson*,

13

225 F.3d 899, 905 n. 1 (7th Cir. 2000) (doubting that panhandling falls within the definition of commercial speech).

### D. Defendant cannot ban busking within WMATA public forums even under intermediate scrutiny

Defendant's interpretation of its regulation is that all busking is banned on all the public forums within its transit stations and grounds at all times. *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1391 (D.C. Cir. 1990) (above-ground areas of WMATA stations are public forums, either traditional or by designation).

A content-neutral restriction that prohibits a form of speech on a public forum typically must (1) serve a significant government interest, (2) be narrowly tailored to serve that interest, and (3) leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-99 (1989). However, when the regulation constitutes an absolute prohibition on a particular type of expression, the governmental interest must be compelling. *United States v. Grace*, 461 U.S. 171, 177 (1983) ("[A]n absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest"). Under the narrow tailoring prong, a regulation that limits speech does not have to be the least restrictive remedy available; however, it may not burden substantially more speech than necessary to meet the government's significant interest. *Ward*, 491 U.S. at 798-99 (1989). The same standards apply whether the forum is inherently public, or is given public forum status by a government agency. *Perry Educ. Ass'n v. Perry Educators' Ass'n*, 460 U.S. 37, 46-47 (1983).

### 1. The ban does not serve a significant government interest.

The Defendant cannot possibly posit a significant government interest served by an absolute ban on busking and commercial speech that allows other forms of speech. The Supreme Court has held that the government interest used to justify speech restrictions must be based on real anticipated harms, not conjecture:

> "When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."

*Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 664 (1994); *see also, Weinberg v. City of Chicago*, 310 F.3d 1029, 1038-39 (7th Cir. 2002) ("the [government] cannot blindly invoke safety and congestion"); *Kuba v. 1-A Agricultural Ass'n*, 387 F.3d 850, 859-60 (9th Cir. 2004) ("merely invoking interests in regulating traffic around an exhibit or performance facility is insufficient. The government must also show that the proposed communicative activity endangers those interests" as informed by "actual experience"); *Saieg v. City of Dearborn*, 641 F.3d 727, 736-37 (6th Cir. 2011) (general interests in pedestrian traffic and safety are insufficient; the government "must do more [] than assert interests that are important in the abstract").

To the extent that the WMATA has an interest in pedestrian movement, that interest is served by the 15-foot buffer zone around potential pedestrian choke points (escalator, stairwell, faregate, mezzanine gate, kiosk, or fare card machine), which applies to all forms of speech, and which Mr. Young does not challenge. Away from those potential choke points, there is no legitimate government interest that would warrant banning busking (in which donations are passively sought) and commercial speech, but not any other forms of speech. *See, e.g.*,

*Cincinnati v. Discovery Network*, 507 U.S. 410, 424 (1993) ("Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship whatsoever to the particular interests that the city has asserted [safety and aesthetics]"). Defendant does not contest that Mr. Young is allowed to play his guitar with a closed guitar case, but prohibits his speech merely because he passively seeks donations. Such a distinction is impermissible. *Id.*; *Riley v. Nat'l Fed'n of the Blind of N. C.*, 487 U.S. 781, 801 (1988) ("It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak"); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 n. 5 (1988) ("the degree of First Amendment protection is not diminished merely because the . . . speech is sold rather than given away").

2. **The ban is not narrowly tailored.**

The ban is not narrowly tailored because it burdens substantially more speech than necessary to serve the government's interest. First, allowing other activities in an area where speech is restricted suggests that the venue can accommodate the restricted speech. *Jews for Jesus v. Massachusetts Bay Transp. Auth.*, 984 F.2d 1319, 1325 (1st Cir. 1993); *Weinberg v. City of Chicago*, 310 F.3d 1029, 1039 (7th Cir. 2002); *Kuba v. 1-A Agricultural Ass'n.*, 387 F.3d 850, 858 n. 9 (9th Cir. 2004); *Saieg v. City of Dearborn*, 641 F.3d 727, 737, 741 (6th Cir. 2011).

In this case, the Defendant has banned all commercial speech, panhandling, and busking across the entire expanse of all its public forums. The ban burdens substantially more speech than necessary to serve any legitimate government interest. *See, e.g.*, *Browne v. City of Grand Junction*, 2014 U.S. Dist. LEXIS 37516 (D. Colo. 2014) (granting temporary restraining order and preliminary injunction against ban on all panhandling and soliciting directed at vehicles on

16

state highways; ban not narrowly tailored because it included passive solicitation where vehicles might pull over safely). Furthermore, the ban makes an impermissible distinction between expressive communication that is given away without a request for compensation and that which solicits donations. *Riley*, 487 U.S. at 801; *Lakewood*, 486 U.S. at 756 n. 5.

Additionally, there are many obviously less speech-restrictive alternatives on vending than a complete ban. For example, WMATA could adopt regulations such as those contained in D.C. Munic. Reg. § 24-525(f) (prohibiting vending within twenty feet of the street-level entry to a Metrorail escalator and ten feet of the street-level door to a Metrorail elevator). Alternatively, impositions might be imposed on the amount of space taken up by a busker, or the manner in which donations are solicited or accepted.

### 3. The ban does not leave open alternative channels of communication.

To be adequate, an alternative channel of communication does not have to be the speaker's first choice. *Heffron v. Int'l Soc. for Krishna Consciousness*, 452 U.S. 640, 647 (1981). However, "[t]he mere existence of an alternative method of communication cannot be the end of the analysis. [One] must also give adequate consideration to whether the alternatives are ample. Whether an alternative is ample should be considered from the speaker's point of view." *Weinberg*, 310 F.3d at 1041 (recognizing that it would not be ample for peddler of book critical of sports team to sell his book away from stadium, relying in part on *City of Ladue v. Gilleo*, 512 U.S. 43, 56-57 (1994)). "[T]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988).

Here, because the Defendant has banned all busking and panhandling on all its public forums, it cannot be said to have left open ample alternative channels of communication. The alternative provided – playing music, but with a close guitar case and refusing donations – is not adequate because it does not convey the same message. Young's solicitation of donations is itself entitled to First Amendment protection, whether or not he is simultaneously playing an instrument.

There are, of course, alternative locations in the Washington Metropolitan area for Mr. Young to busk. The decision of the D.C. Circuit in *Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990), however, conclusively rejected the notion that such alternatives are sufficient. In *Turner*, the D.C. Circuit held that there were not ample alternatives available because "WMATA's permit requirement *completely* excludes those desiring to engage in organized free speech activity from the above-ground free areas of WMATA property unless they have a permit. There are no WMATA areas not covered by the permit requirement." *Id.* (emphasis in original.) Likewise, the WMATA Use regulation at issue here, which concerns commercial activity, "completely excludes" Mr. Young from busking in "any above-ground free area of WMATA," and there is no WMATA area not covered by the prohibition.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff summary judgment.

/s/ Jeffrey Light
Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

18

*Counsel for Plaintiff and Participating Attorney for*
*THE RUTHERFORD INSTITUTE*